1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| T-MOBILE WEST CORPORATION, a Delaware corporation, | Case No:  CV 09-9077 DSF (PJWx) |
| Plaintiff, | **[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | |
| CITY OF AGOURA HILLS, a public entity organized and existing under the laws of the State of California; and the CITY COUNCIL OF THE CITY OF AGOURA HILLS, | Judge:        Hon. Dale S. Fischer |
| Defendants. | |

[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

FINDINGS OF FACT ...............................................................................................1

1.   PLAINTIFF ...................................................................................................1

2.   DEFENDANTS ..............................................................................................1

3.   JURISDICTION AND VENUE .....................................................................1

4.   HISTORY ......................................................................................................2

CONCLUSIONS OF LAW ...................................................................................12

A.   The City's Denial Constitutes an Unlawful Prohibition of Service Because It Effectively Prohibits T-Mobile From Using the Least Intrusive Means to Fill a Significant Gap in Coverage. .......................................................................12

    1.   T-Mobile Has Shown That There Is a Significant Gap in Its Coverage; and the City Conceded the Existence of a Significant Gap at Trial. ......................................13

    2.   T-Mobile Has Made a Prima Facie Showing That the Facility Is the Least Intrusive, Technologically Feasible and Available Means to Fill the Significant Gap in Coverage. ......................................................................................14

    3.   The City Has Failed to Carry Its Burden of Showing That There Is a Less Intrusive, Potentially Available and Technologically Feasible Alternative. .............18

B.   The Proper Remedy Is an Injunction Ordering Issuance of the CUP. ...................24

[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

**FINDINGS OF FACT**

The Court finds the following facts supported by the evidence.[1]

**1.   PLAINTIFF**

1.      Plaintiff T-Mobile West Corporation is a Delaware corporation with its principal place of business in Bellevue, Washington.

2.      Plaintiff T-Mobile West Corporation is the operating entity for T-Mobile USA, Inc. in the Southern California market and, as such, uses Federal Communications Commission licenses held by related T-Mobile entities to provide commercial mobile radio services within the Southern California area.  Thus, Plaintiff T-Mobile West Corporation provides personal wireless services, and therefore operates commercial mobile services, as defined by federal law, and markets them in Southern California under the name T-Mobile.

3.      T-Mobile West Corporation is the successor in interest to Omnipoint Communications, Inc., for the purposes of this litigation.

**2.   DEFENDANTS**

4.      Defendant City of Agoura Hills is a public entity organized and existing under the laws of the State of California.

5.      Defendant City Council of the City of Agoura Hills is the governing body of the City of Agoura Hills.

**3.   JURISDICTION AND VENUE**

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1332 (diversity), and 1337 (commerce), as well as under 47 U.S.C. § 332.

---

[1] Any finding of fact that is more properly considered a conclusion shall be so construed. Any conclusion of law that is more properly considered a finding of fact shall be so construed.

[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

7.    Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

**4.    HISTORY**

8.    On March 7, 2007, Omnipoint Communications, Inc., T-Mobile's predecessor in interest, applied for a CUP (Case No. 07-CUP-007) to install a wireless telecommunications facility ("Facility") that would fill a significant gap in coverage in T-Mobile's network in the residential areas north of Thousand Oaks Boulevard and east of Lindero Canyon Road, and along a portion of Thousand Oaks Boulevard and Reyes Adobe Road in the City of Agoura Hills, California.  (1:0002-A-0002-O.)[2]  The City's CUP application form does not require that an applicant for a CUP provide an analysis of the availability or technological feasibility of alternatives to a proposed wireless telecommunications facility.  (*Id*.)

9.    The Facility will be located at 5844 Larboard Lane, on Assessor's Parcel No. 2056-015-900, on the grounds of the Lindero Canyon Middle School ("School Site").  (5:0020.)

10.    Between April 2007 and October 2008, T-Mobile worked with City staff and the Las Virgenes Unified School District ("School District") to develop the flagpole design for consistency with the existing use of the property and the design of the newly remodeled school.  (23:0399.)

11.    When it first applied for a conditional use permit ("CUP") for a wireless facility at the school, T-Mobile proposed a 50-foot tall flag pole to support and conceal the antennas.  (1:0001.)

12.    Working together, T-Mobile, the school district, and City Planning and Community Development staff settled on a three-pole design, since it better fit with the

---

[2]  All citations to the Administrative Record are to the tab number and page number.

[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

look of the newly renovated campus than would artificial tree designs.  (23:0400, 0408-09, 0426.)

13.    Each pole would be 18 inches in diameter so as to accommodate the antennas, and the center pole would be 45-feet tall, while two 40-foot tall poles would flank the center pole.  (5:0021.)

14.    The Facility would include six associated ground-mounted equipment cabinets surrounded and screened from view by an eight-foot-tall masonry wall enclosure, painted to match existing buildings, and equipped with a black wrought iron lid and a corrugated steel gate.  (5:0022.)

15.    The equipment enclosure would be further screened by installing a new planter area on the north and west sides of the enclosure.  (*Id*.)

16.    To further minimize any visual impacts, T-Mobile proposed to locate the facility at the center of the campus, approximately 300 feet from the nearest residence.  (5:0021; 29:0637 (aerial photo of location).)

17.    T-Mobile's application came before the Planning Commission on February 5, 2009.  (6:0055.)

18.    The staff report analyzed T-Mobile's application to determine if each of the six findings required to grant a CUP could be made.  (5:0022-23.)

19.    Staff concluded that they could be, and recommended Planning Commission approval of the CUP, subject to the conditions set forth in a draft resolution.  (5:0023.)

20.    The Planning Commission continued the hearing to March 5, 2009, to receive more information on the scope of its discretion from the City Attorney's office (9:0119-20), and more information from T-Mobile regarding the need for the facility (7:0101-07; 9:0128-30).

21.    At the second hearing, on March 5, 2009, T-Mobile's representative explained that most of the districts in the search ring are zoned R (Residential), and the City's Zoning Ordinance does not permit telecommunications facilities in the R zone, even as a conditional use.  (11:0169.)  He also explained that "There were two alternative

- 3 -

[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

sites that we looked at.  One was placing our antenna on a . . . light standard.  But that would unfortunately, due to the grade of where Thousand Oaks Blvd. sits, and our coverage objective, it won't achieve what we'd like."  (11:0171.)  T-Mobile considered a second candidate at St. Paul's Church near the intersection of Thousand Oaks and Reyes Adobe Boulevards.  But that site is zoned RS-CD, and the City's Zoning Ordinance does not permit wireless facilities in any of the R zoned areas.  (11:0171-72.)

     22.    After considering the evidence, including statements by members of the public, the Planning Commission voted to approve T-Mobile's CUP application and adopted Resolution 961, which includes the following findings:

1. the Facility, "as conditioned, is consistent with the objectives and the provisions of the Zoning Ordinance and the purposes of the School District (SH) zone in which the use is located.  Wireless telecommunication facilities are allowed in the School District (SH) zone, subject to the issuance of a Conditional Use Permit.  The proposed antennas will be hidden within a pole design, which appears as a flag pole and does not have the visual mass of the typical monopole array antennas";

2. the Facility, "as conditioned, is compatible with the surrounding properties.  The proposed antennas will be concealed within the top of an 18 inch wide galvanized steel flag pole 'radome'.  Consequently, the project would not visually impact the surrounding residential community in that the antennas appear as only a flag pole, typically found on a school campus";

3. the Facility, "as conditioned, and the conditions under which it would be operated and maintained will not be detrimental to the public health, safety or welfare.Wireless telecommunication facilities are regulated through the State Public Utilities Commission as a public utility, which has addressed health and safety issues.  The antenna installation will comply with FCC regulations, the National Electric Code, ANSE, and any applicable published federal standards that pertain to electromagnetic field exposure limits and the safe installation and maintenance of electric and radio frequency equipment.  Compliance with the aforementioned regulations and standards is a condition of the conditional use permit, and any noncompliance may result in an immediate revocation of the permit.  The proposed antenna and equipment will be installed such that they are

- 4 -
[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

incorporated into existing school facilities and no additional traffic or parking demand for this use is anticipated";

4. the Facility, "as conditioned, will comply with each of the applicable provisions of the Zoning Ordinance. Telecommunications facilities are allowed in the School District (SH) zone, subject to the issuance of a Conditional Use Permit. The location of the antennas and ancillary equipment will comply with the state and federal requirements";

5. the Facility, "as conditioned, will maintain the diversity of the community. The nearest wireless telecommunication facility is located at Kanan Road and Thousand Oaks Boulevard, as such, the new facility would not contribute to the over-concentration of similar uses"; and

6. the Facility "is consistent with the goals, objectives and policies of the General Plan. The General Plan Community Design Element calls for an efficiently organized and aesthetically pleasing City. The proposed project meets this goal by locating the new antennas on new antenna flag poles and screening the required ancillary equipment from public view."

(12:0208-09.)

23.    A member of the City Council made a motion to appeal the decision of the Planning Commission, and the City Council voted to appeal the approval sua sponte. (14:0223, 0226; 15:0253.)

24.    In order to further minimize any visual impacts, T-Mobile, taking advantage of a different technology, presented a single-pole design to City staff before the first hearing on the appeal. (18:0263; 32:0701.)

25.    At the June 10, 2009 City Council meeting, T-Mobile demonstrated that the Facility was needed to fill a significant gap in in-building service, as well as a gap in service for motorists traveling along Thousand Oaks Boulevard and Reyes Adobe Road. (23:0401, 0407, 0411-12, 0424-25 (referring to color propagation maps at 8:0128-30).)

26.    T-Mobile explained that the gray areas on the maps represent "poor" or no outdoor coverage; yellow represents "fair" outdoor and indoor coverage, but poor or no

1  in-building coverage; and green represents "good" coverage both outdoors and in-
2  building.  (*Id*.)

3      27.    T-Mobile also explained why it had ruled out the alternatives at St. Paul's
4  Church on Thousand Oaks Boulevard, and placement of one or more antennas on top of
5  existing light standards at the intersection of Thousand Oaks Boulevard and Reyes Adobe
6  Road.  (23:0420-421, 0423.)

7      28.    Members of the City Council expressed concerns about whether the Las
8  Virgenes Unified School District ("School District") had considered the safety of RF
9  transmissions, and raised questions about the visual impact of the flagpole design.
10  (23:0428-29; 0431-33.)

11      29.    Although consideration of the environmental effects of radio frequency
12  ("RF") emissions from wireless telecommunications facilities is precluded by federal
13  law, the Council directed City staff to prepare a letter to the School District, requesting
14  that the Board of Education conduct a public hearing on the health and safety of the RF
15  emissions, and "to include the Lindero Canyon Middle School as part of the subject
16  matter of that debate."  (23:0433.)

17      30.    Mayor Weber asked if T-Mobile would put up a "story pole" that would give
18  residents an opportunity to see the location and height of the Facility, and T-Mobile
19  agreed to do so.  (23:0428-29.)  Two City Councilmembers also asked if T-Mobile would
20  also provide the City Council "with a map showing the geographic area that they were
21  looking at, in which to locate a facility[,]" and "some . . . of the machinations that they've
22  gone through to select this site . . . ."  (23:0430-31.)

23      31.    The City Council continued the appeal hearing to September 23, 2010, to
24  allow enough time for the school district to hold a meeting at which it would consider the
25  safety of RF emissions.  (23:0433, 0436.)

26      32.    As promised, T-Mobile erected the 45-foot tall story pole, gave notice to
27  nearby residents, and left the story pole in place for two weeks, beginning at the end of
28  July 2009.  (28:0503; 24:0444-45; 32:0701.)

[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

33.   In the meantime, the School District placed an information item on its August 18, 2009 regular board meeting to consider information regarding RF environmental and health concerns.  (28:0503.)

34.   The School District retained a recognized expert in the field of RF, who concluded that the theoretical maximum potential public exposure to RF from the Facility would be tens of thousands of times below the scientifically established threshold of potentially significant adverse health effects.  (40:0827.)

35.   At the continued September 23, 2009 hearing, T-Mobile presented three updated "propagation maps" based on empirical drive-test data.  (24:0446-48; 29:06541-42.)

36.   The propagation maps represent the signal strength and coverage of T-Mobile's two existing facilities in Agoura Hills, the predicted combined coverage achieved by adding the proposed Facility, and the predicted coverage of the Facility alone.  (32:0702-03.)

37.   In response to the request for additional alternatives analysis, T-Mobile submitted an additional alternative site analysis on August 10, 2009, along with photographic simulations of the Facility, updated propagation maps, and photographs of the story pole that had been in place since July 29, 2009.  (28:0512-29.)

38.   At the September 23, 2009 hearing, T-Mobile presented a slide presentation that summarized T-Mobile's reasons for choosing the School Site and flag pole design as the least intrusive, available, and feasible alternative.  (29:0636-54; 32:0703-07.)

39.   T-Mobile studied power transmission towers, commercial properties, locating facilities in the rights-of-way along Thousand Oaks Boulevard and along two residential streets, as well as a site next to a water tank owned by the Las Virgenes Municipal Water District ("Water District").  (29:0645-46.)

40.   Most of the sites were ruled out because the City's zoning ordinance does not allow wireless facilities, even as a conditionally permitted use, or because they were

1   technologically infeasible, or a combination of both.  (24:0440-42; 29:0645-46; 32:0703-
2   07, 0735-36.)

3       41.    The only alternatives to the middle school site that were potentially
4   technologically capable of filling the coverage gap were the rights-of-way locations and
5   the water tank.  (32:0703-05.)

6       42.    However, the water tank site was ruled out by T-Mobile because it is located
7   in the "U" (Utility) district, which does not allow wireless facilities, even as a
8   conditionally permitted use.  (24:0440; 32:0704; 45:1023-24.)  But T-Mobile also
9   explained that other factors render the water tank site speculative, including the fact that
10  locating a facility there would place a facility even closer to residential uses than the
11  school site, which would likely draw opposition from residents near the water tank, and it
12  was not known whether the Water District would lease the land to T-Mobile.  (24:0440;
13  32:0704; 45:1023-24.)

14      43.    T-Mobile also noted that the rights-of-way alternatives were ruled out
15  because it would place the antennas immediately adjacent to residential uses, which
16  would likely be opposed by residents; the City has no regulatory standards or protocols
17  for locating facilities in the rights-of-way; there are potential obstacles to constructing
18  vaults or other enclosures to house the equipment boxes; and the kinds of antennas
19  required could not be optimized or upgraded as easily as the Facility, and would likely
20  require more antennas located elsewhere in the right-of-way as a result.  (24:0442;
21  32:0705-06, 0708, 0746-47.)

22      44.    The City Council continued the hearing a second time, to October 28, 2009,
23  and directed staff to retain the services of an RF consultant to verify T-Mobile's coverage
24  gap and to evaluate T-Mobile's alternative site analysis.  (32:0722, 0744, 0750, 0757,
25  0761.)

26      The City also requested that T-Mobile study the feasibility of constructing a
27  facility in the Thousand Oaks Boulevard right-of-way, and asked it to consider using

28

[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   infrastructure that was supposed to be made available to wireless service providers by a
2   company called NextG.  (32:0722, 0748.)

3       45.    The City retained Mr. Jack Unger, a wireless communications consultant
4   with over 17 years of experience working for private companies, special districts, and
5   cities.  (43:0850.)  Based on his empirical tests and computer modeling, Mr. Unger
6   concluded that T-Mobile's propagation maps were accurate.  (41:0839; 43:0850-51;
7   45:1017-18.)

8       46.    He also noted that there are areas in the gap that clearly need coverage, and
9   that areas represented as "fair" (yellow on the propagation maps) may actually represent
10  areas of "poor" or no coverage indoors, because all of his data were collected outdoors.
11  (48:0834, Note.)

12      47.    Mr. Unger and City staff analyzed the alternatives T-Mobile had presented.
13  (43:0850-851.)  Mr. Unger  concluded that "there is generally equal to or slightly less
14  coverage than what was shown on T-Mobile's propagation map of existing conditions[,]"
15  and "T-Mobile's propagation map with the proposed cell site at the school [is] generally
16  accurate."  (*Id*.)  Specifically, Mr. Unger and City staff found that several sites were, as
17  T-Mobile had explained, technologically infeasible because they were either too close to
18  existing T-Mobile sites, or because the surrounding topography would prevent T-Mobile
19  from covering the gap.  (*Id*.)

20      48.    Mr. Unger and the City staff also concluded that several of the alternative
21  sites that T-Mobile analyzed would be "difficult from a legislative standpoint" in light of
22  the City's zoning code.  (*Id*., 0851.)

23      49.    The City's zoning code limits the placement of wireless telecommunications
24  facilities to properties zoned BP (Business Park) or SH (School), subject to issuance of a
25  CUP.  (24:0439-42; 29:0636-54.)

26      50.    Mr. Unger determined that the coverage that would result from the right-of-
27  way alternative on Thousand Oaks Boulevard would not be as good as the Facility's, but

28

[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  he opined that if a facility were located at the water tank, it might provide slightly better

2  coverage.  (41:0839-43; 43:0851; 45:1019.)

3        51.    Referring to the right-of-way alternative, Mr. Unger informed staff that

4  "typically there are issues associated with placement on any right-of-way as to location of

5  its accessory equipment, the possible trenching for connections, and structural limitations

6  associated with placement [of antennas] on existing light poles which could make this

7  option difficult."  (43:0851.)

8        52.    With respect to the water tank site, staff explained that a facility cannot be

9  located there unless the City were to amend its zoning ordinance.  (43:0883.)

10       53.    The staff also noted that the legislative action would require analysis under

11 the California Environmental Quality Act, several public hearings, and could take at least

12 3-6 months (*id.*), and that it could not analyze the aesthetic impacts of a facility at the

13 water tank because T-Mobile would have to submit designs with a new CUP application

14 if and when the ordinance was amended (*id.*; 43:0852).

15       54.    On October 14, 2009, citing such issues as the potential for additional

16 wireless facilities near residential uses and along rights-of-way raised by T-Mobile's

17 CUP application, the City adopted an urgency ordinance imposing a temporary

18 moratorium on the issuance of any discretionary permits for wireless facilities.

19 (38:0807("Wireless Moratorium").)  The City extended the moratorium on November 10,

20 2009.  (54:1159.)  The Wireless Moratorium is still in place today.

21       55.    At the continued hearing of October 28, 2009, T-Mobile responded to the

22 City Council's earlier request to explore the possibility of using NextG's infrastructure.

23 T-Mobile explained that it ruled out using NextG's infrastructure because NextG uses a

24 different technology, that such technology is used to fill smaller gaps in service, and, in

25 any event, the infrastructure was not yet available.  (45:1021, 1043-44.)

26       56.    Also in response to City Council's earlier inquiry, T-Mobile explained that

27 there is a storm sewer running down the center of the median on Thousand Oaks

28

[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Boulevard where the underground vault for the equipment boxes for a right-of-way alternative would have to be placed 10- to 15-feet below grade.  (45:1025.)

57.     T-Mobile explained that where underground utilities such as a sewer line preclude placement of the equipment boxes in an underground vault, they would have to be placed in the median of Thousand Oaks Boulevard in an 8-foot tall above-ground enclosure similar to the one planned for the middle school Facility.  (32:0747.)

58.     T-Mobile also advised the City Council that it did not consider the water tank site when it applied for the CUP in 2007, or at any time leading up to the issuance of the CUP in March 2009, because wireless facilities are not permitted in the U district. (45:1026.)

59.     Having responded to the questions raised by the City Council at the September 23, 2009 hearing, including a request for detailed information about potential alternatives to the School Site, T-Mobile requested a decision on the City's CUP appeal. (45:1028.)

60.     The City Council, however, requested that T-Mobile agree to an additional 90-day continuance so that T-Mobile could explore the feasibility of constructing a facility at the water tank site, while the City staff explored what, and how long, it would take to amend the zoning code.  (45:1054, 1056.)

61.     T-Mobile declined, having explained that it had already worked for several years to obtain the CUP for the Facility, it had worked with the School District and City staff to re-design the Facility to minimize visual impacts, and it is entitled to a decision based on the zoning ordinance currently in effect.  (45:1028, 1056.)

62.     At the conclusion of the October 28, 2009 hearing, the City Council voted to grant the appeal filed by the City Councilmember, and denied T-Mobile's application for the CUP.  (45:1057.)

63.     At its November 10, 2009 hearing, the City Council adopted Resolution No. 09-1532, granting the appeal and denying T-Mobile's CUP application.

# CONCLUSIONS OF LAW

## I.    FIRST CLAIM FOR RELIEF
### (LACK OF SUBSTANTIAL EVIDENCE)

64.    Claims for relief based on 47 U.S.C. § 332(c)(7)(B)(iii) (Lack of Substantial Evidence) and 47 U.S.C. § 332(c)(7)(B)(i)(II) (Unlawful Prohibition of Service) are analyzed separately.  47 U.S.C. § 332(c)(7)(B); *Newpath Networks LLC v. City of Irvine*, No. SACV 06-550, 2009 U.S. Dist. LEXIS 126178, at \*58 (C.D. Cal. Dec. 23, 2009); *see also VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 833 (7th Cir. 2003); *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002); *APT Pittsburgh Ltd. P'ship v. Penn Township Butler County*, 196 F.3d 469, 480 (3d Cir. 1999).  A decision in favor of T-Mobile on the Second Claim for Relief (Unlawful Prohibition of Service) would require a judgment in favor of T-Mobile even if the Court had decided that substantial evidence supports the denial.  *See, e.g.*, *T-Mobile v. City of Anacortes*, 572 F.3d 987, 999 (9th Cir. 2009) ("*City of Anacortes*").  Because T-Mobile has prevailed on its Second Claim for Relief (Unlawful Prohibition of Service), it is not necessary for the Court to reach and decide the First Claim for Relief (Lack of Substantial Evidence).

## II.    SECOND CLAIM FOR RELIEF
### (UNLAWFUL PROHIBITION OF SERVICE)

**A.    The City's Denial Constitutes an Unlawful Prohibition of Service Because It Effectively Prohibits T-Mobile From Using the Least Intrusive Means to Fill a Significant Gap in Coverage.**

65.    The City's denial violates 47 U.S.C. § 332(c)(7)(B)(i)(II), which provides that it is unlawful for a public agency to "prohibit or have the effect of prohibiting the provision of personal wireless services."  A ban on new wireless facilities would, of course, constitute a prohibition of personal wireless services.  *MetroPCS, Inc. v. City & County of San Francisco*, 400 F.3d 715, 730-31 (9th Cir. 2005) ("*MetroPCS*").  But absent an outright ban, a denial constitutes an effective prohibition if a

telecommunications service provider has a significant gap in service, and it has proposed the least intrusive means to fill the gap.  *Id*. at 730-31.  In  *City of Anacortes*, 572 F.3d at 998, the Ninth Circuit held that when a provider makes a prima facie showing that the proposed facility is the least intrusive means of filling a significant gap, the government cannot simply reject the provider's evidence.  Instead, the government must show that there are potentially available and technologically feasible alternatives.  *Id*.  A speculative alternative is not a viable alternative.  *Id*.

### 1.  T-Mobile Has Shown That There Is a Significant Gap in Its Coverage; and the City Conceded the Existence of a Significant Gap at Trial.

66.     In *MetroPCS,* the Ninth Circuit held that a "significant gap in service (and thus an effective prohibition of service) exists whenever a provider is prevented from filling a significant gap in ***its own*** service coverage."  400 F.3d at 733 (emphasis in original).  Moreover, a gap in a provider's in-home coverage that consists of more than a few isolated pockets of inadequate in-home coverage suffices to show a significant gap exists.  *MetroPCS, Inc. v. City & County of San Francisco*, No. C02-3442, 2006 WL 1699580, at *10 (N.D. Cal. June 16, 2006), *on remand from* 400 F.3d 715 (9th Cir. 2005) ("[W]here coverage holes are large or frequent in number and size, and extend to the interior of buildings in urban areas or to a significant number of residences in well-populated areas, such coverage holes ***are*** actionable under the [Telecom Act]."  (citations omitted) (emphasis in original) ).

67.     T-Mobile established the significance of the gap in its coverage in the area surrounding Thousand Oaks Boulevard and Adobe Reyes Road, and the City has made no attempt to challenge T-Mobile's showing.  (9:0128-30 (original propagation maps); 11:0168 (explaining same); 24:0446-48 (revised propagation maps); 41:0839 (City's RF consultant confirming).)  (41:0838, Fig. 6, 41:0840 (maps of existing coverage).)  The City's consultant agreed with T-Mobile.  (41:0839 (emphasis original).)  In addition, Thousand Oaks Boulevard is a "heavily traveled" four-lane "primary arterial" that bears

1  nearly 15,000 vehicles per day, including three bus lines.  (29:0640; 32:0702, 0749;

2  Plaintiff's Request for Judicial Notice ("RJN"), Exh. F [excerpt of City of Agoura Hills

3  General Plan 2035 Environmental Impact Report], 63-64, 66, 73 (ECF No. 19-2).)  Reyes

4  Adobe Road is a north-south, four-lane "secondary arterial" that provides access to the

5  101 freeway for nearly 11,000 vehicles per day (RJN, Exh. F at 63-64, 73).  *See Sprint*

6  *PCS Assets, L.L.C. v. City of Palos Verdes Estates*, 583 F.3d 716, 727 (9th Cir. 2009)

7  (gap over major commuter thoroughfare is legally significant).

8       68.    The Administrative Record is replete with undisputed evidence of the gap in

9  coverage.  (24:0446-48; 29:0640; 32:0702, 0749; RJN, Exh. F at 63-64, 66, 73; 32:0702-

10  03; 23:0401, 0407; 0411-12, 0424-25; 29:0640-41; 32:0702-03; 41:0834, Fig. 2; 41:0838,

11  Fig. 6; 41:0840 (existing coverage); *see also* Declaration of Daniel Paul, T-Mobile's

12  Regional Director of Engineering, and Exhibits 1-7, p. 9, ¶ 29; p. 6, ¶ 19 (confirming the

13  significant gap established by the materials submitted by T-Mobile during the

14  administrative proceedings).)

15       69.    The evidence in this case demonstrates that each of the gaps in coverage –

16  in-vehicle/outdoors and in-building – constitutes a significant gap, the existence of which

17  is confirmed by the City's own RF consultant's propagation maps.

18       70.    At trial, the City conceded that there is a significant gap in T-Mobile's

19  coverage.

20              **2.    T-Mobile Has Made a Prima Facie Showing That the Facility Is**
21              **the Least Intrusive, Technologically Feasible and Available Means**
                **to Fill the Significant Gap in Coverage.**
22

23       71.    T-Mobile established that the Facility is the least intrusive means by

24  undertaking a "meaningful comparison of alternative sites" to identify "the best solution

25  for the community" in selecting the proposed site.  *MetroPCS*, 400 F.3d at 735.  As the

26  record evidence shows, T-Mobile analyzed nine alternatives.  (24:0439-42 (analysis of

27  eight alternatives); 29:0637-54 (slide presentation analyzing nine alternatives); 32:0701-

28  07 (T-Mobile's presentation of the alternatives analysis).)

72.     As T-Mobile explained in its CUP application, locating a wireless facility is not easy.  "Like traditional wireless phone systems, the proposed addition to the network operates on a 'grid' system, whereby overlapping 'cells' mesh to form a seamless wireless network."  (1:0002-E.)  When T-Mobile identifies a coverage gap, it establishes a "search ring" around the gap where, in theory, a facility may be technologically capable of filling the coverage gap.  (32:0703.)  T-Mobile then analyzes locations in and around the search ring.  (32:0703-04.)  In assessing the feasibility of an alternative, "[t]opography and other natural or man-made obstructions are evaluated for radio signal blockage to assess the line-of-sight transmission issues with respect to the proposed coverage area."  (1:0002-F; 7:0089.)  Furthermore, for an alternative to be "feasible," at a minimum, the site must have access to available utilities, it must be capable of supporting the antennas, and there must be enough space, above or below ground, to place the equipment boxes (six, in this case).  (1:0002-D; 43:0851.)  An alternative site must also be "available" as well:  A proposed alternative must be zoned to allow for wireless telecommunications facilities, and the site must have a landlord who is willing to enter into a lease with a service provider.  (1:0002-D; 32:0713.)

73.     The zoning ordinance conditionally permits wireless facilities in only Business Park (BP-OR and BP-M) and School (SH) zoning districts, subject to issuance of a CUP.  (24:0440; 32:0703-05.)  On four previous occasions, the City found that wireless facilities are consistent with the SH zone.  (40:0818; 48:1108; RJN, Exhs. B-E at 34-35, 39-40, 46-47, 53-54 (resolutions approving CUPs for Sprint PCS, AT&T, Cingular Wireless, and Verizon Wireless to install wireless antennas reaching heights of 85 feet and as large as 36 inches in diameter at the base tapering to 26 inches in diameter at the top).)

74.     In light of these constraints, T-Mobile analyzed nine alternative locations: an elementary school, a church, a recreation center, a commercial property in Westlake Village, the intersection of Lake Lindero Drive and Thousand Oaks Boulevard, mounting antennas on existing transmission towers, the water tank site, and mounting antennas on

[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

existing light standards in two different rights-of-way, including the right-of-way along Thousand Oaks Boulevard.

75.    Locating a facility at a nearby elementary school is technologically infeasible because the "topography of the area would not permit signals to reach the target coverage area," and "this location places the antennas in closer proximity to residential uses . . . ."  (24:0441.)

76.    A facility at the St. Paul Lutheran Church or the adjacent Agoura Hills Recreation Center is not feasible or available because they are situated in the RS-CD district (where the use is not permitted), topography and trees in the area would make it difficult to meet the coverage objective, and it would place the antennas in close proximity to residential uses.  (24:0441; 32:0704.)

77.    T-Mobile also considered a commercial property in Westlake Village, but it would place the antennas too close to an existing T-Mobile facility and would not, therefore, fill the coverage gap.  (*Id*.)

78.    Locating a facility at the intersection of Lake Lindero Drive and Thousand Oaks Boulevard (either on a commercial property or on the poles supporting the nets of a driving range) was ruled out because the sites are unavailable, zoned CS and CR, respectively, and those locations would be infeasible because they are too close to another existing T-Mobile facility.  (24:0442; 32:0704-05.)

79.    T-Mobile also considered locating a facility on transmission towers running up Lake Lindero Drive, or running north from the water tank to Reyes Adobe Road because doing so would meet its coverage objective.  (24:0442; 32:0708.)  However, the transmission towers are located in the OS-R/DR district, and would require the 2/3 approval of the voters to locate in the Open Space district.  (24:0442; 32:0735.)

80.    The City at no time contended that any of the above-described alternatives was available and feasible.  Indeed, City staff and the City's RF consultant analyzed the alternatives T-Mobile had presented, confirmed the accuracy of T-Mobile's propagation maps, and found that several sites were, as T-Mobile had explained, technologically

1   infeasible because they were either too close to existing T-Mobile sites, or because the

2   surrounding topography would prevent T-Mobile from covering the gap.  (43:0850-851.)

3   Mr. Unger and the City staff also concluded that several of the alternative sites that T-

4   Mobile analyzed would be "difficult from a legislative standpoint" in light of the City's

5   zoning code.  (*Id*., 0851.)

6        81.    The water tank location is unavailable because it is located in the U zoning

7   district, where wireless telecommunications facilities are not a permitted use.  (24:0440;

8   32:0704; 43:0852; 45:1023-24.)

9        82.    The preclusive zoning made the water tank alternative unavailable.  But in

10   addition to the preclusive zoning, there are other factors that render the water tank

11   alternative speculative.  As T-Mobile pointed out, it would place a facility in closer

12   proximity to residential uses than the school site, which would draw opposition from

13   residents, and it was not known whether the Water District would lease land at the water

14   tank site to T-Mobile.  (24:0440; 32:0704; 45:1023-24.)  *City of Anacortes*, 572 F.3d at

15   998 (speculative alternative is not a viable alternative).

16        83.    T-Mobile also analyzed two locations in the right-of-way: one on Thousand

17   Oaks Boulevard, and one comprised of two radomes mounted on light standards at

18   Penrod Drive and the intersection of Lake Lindero Drive and Rainbow Hill Road.

19   (24:0442; 29:0646; 32:0705.)  T-Mobile found that these right-of-way alternatives could

20   potentially meet its coverage objective, but it ruled them out because they would be

21   located immediately adjacent to residential uses; the ability to upgrade and optimize such

22   facilities is more limited and usually requires installation of additional radomes in the

23   vicinity; construction issues often prevent locating the equipment in underground vaults;

24   and the City has no standards or protocol for locating such facilities in its rights-of-way.

25   (24:0442; 32:0705-06.)

26        84.    At the City's request, T-Mobile studied maps of the Thousand Oaks right-of-

27   way and determined that a storm sewer below the median would preclude locating the

28   equipment underground, and would require it to place the equipment behind an 8-foot tall

wall or other screen in the median, which raises both safety issues and unknown aesthetic impacts on motorists and surrounding residences.  (45:1025.)

85.     T-Mobile's analysis, therefore, established a prima facie case that the Facility is the least intrusive, available, and feasible alternative.  *MetroPCS*, 400 F.3d at 735.

**3.     The City Has Failed to Carry Its Burden of Showing That There Is a Less Intrusive, Potentially Available and Technologically Feasible Alternative.**

86.     Based on T-Mobile's prima facie showing that the Facility is the least intrusive, technologically feasible and available means to fill the significant gap, the burden shifted to the City to show that there ***are*** other technologically feasible, potentially available, and less intrusive means to fill the gap.  *City of Anacortes*, 572 F.3d at 998.  Here, the City cites its desire to minimize aesthetic impacts and to avoid locating facilities near residential uses.  (53:1156-57, findings A, A.1, B., C, and D; *see also* Section 4.A.(3)(b)(i), above, discussing the City's concerns over about allowing T-Mobile to be the first service provider to locate facilities in the right-of-way.)  T-Mobile presented visual simulations and erected a story pole or "mock up" of the Facility to demonstrate the minimal extent of any visual impacts.

87.     The City, therefore, bears the burden of showing that there are, in fact, less aesthetically intrusive, available, and feasible alternatives.  *City of Anacortes*, 572 F.3d at 998.  The City has failed to do so.

88.     In its effort to find an alternative to the Facility, the City Council focused on two potential alternatives to the flag pole (1) a structure of indeterminate design and dimensions uphill from the School Site, near a water tank owned by the Water District (45:1047), and (2) an alternative along Thousand Oaks Boulevard (43:0851; 45:1046-47).

89.     However, the argument for the feasibility, availability, or relative aesthetic impacts of the City's proffered alternatives is speculative.

- 18 -

**(1)**   **The City Has Not Met Its Burden of Proving That the "Water Tank Alternative" Is Available, Feasible, or Less Intrusive.**

90.    As already stated, the water tank site is not available because wireless facilities are not permitted in the "U" (Utility) zoning district where the tank is located. (43:0852; RJN, Exh. A at 23 (City of Agoura Hills Municipal Code §§ 9452.1-9453); 45:1023-24.)  *Cf. MetroPCS, Inc. v. City & County of San Francisco*, 400 F.3d 715, 724 (9th Cir. 2005) ("[W]e must take applicable state and local regulations as we find them and evaluate the City decision's evidentiary support (or lack thereof) relative to those regulations.").

91.    The record also demonstrates that there was no evidence regarding the feasibility or visual impacts of the water tank site because there was no design before the Council.  Moreover, it was unknown whether the Water District would lease land to T-Mobile.  In light of these uncertainties, several City Councilmembers suggested that T-Mobile should agree to a third, 90-day continuance of the hearing on the appeal if T-Mobile would be willing to work with the City to study "whether it's feasible. . . . , what the visual impact would be of a, a tower or some other device at or about the water tower. . . . , [and] whether the Water District would even consider [entering a lease with T-Mobile to use its land]."  (45:1053; *see also* 45:1047 (City Councilmember stating: "It's a pig in a poke what that antenna might look like up against that water tower."); 45:1017, 1020, 1033, 1050, 1053.)

92.    The expression of a desire on the part of several City Councilmembers to continue the hearing to explore the possibility of amending its zoning ordinance to allow wireless facilities as a conditional use on property zoned "U" (Utility), to explore the feasibility and aesthetic impacts of a wireless facility of unknown design, and to ascertain whether the Water District would consider entering a lease with T-Mobile does not meet the City's burden of proving that the water tank site is "available" or "a viable alternative," and it fails to meet the City's burden of proving that a water tank alternative

1 would be less "intrusive" on the values sought to be served by the denial (i.e., aesthetic

2 impacts on residential uses).  Speculative alternatives are not viable alternatives, and are

3 therefore neither available nor feasible.  *City of Anacortes*, 572 F.3d at 998.

4       93.    In addition, as the City staff explained to the City Council, in order to place

5 a facility at the water tank, T-Mobile would have to obtain a zoning ordinance

6 amendment ("ZOA"), and, if successful, it would then have to await action on a new

7 CUP application.  (43:0852.)  A ZOA would require environmental analysis under the

8 California Environmental Quality Act ("CEQA"); a public hearing before the Planning

9 Commission; a Planning Commission recommendation to the City Council; a public

10 hearing before the City Council; adoption of the ZOA and approval of the CEQA

11 analysis; submission of a new CUP application by T-Mobile; another hearing before the

12 Planning Commission (at which time visual impacts of the proposed facility would be

13 analyzed); and, possibly, an application for a variance from any new height limits in the

14 amended zoning ordinance.  (43:0883.)  Therefore, in addition to the zoning preclusion

15 and the otherwise speculative nature of the water tank alternative, subjecting T-Mobile to

16 an additional continuance would be contrary to the requirement in 47 U.S.C.

17 § 332(c)(7)(B)(ii), which provides that "[a] State or local government or instrumentality

18 thereof shall act on any request for authorization to place, construct, or modify personal

19 wireless service facilities within a reasonable period of time after the request is duly

20 filed . . . , taking into account the nature and scope of such request."

21       94.    Therefore, the Court finds that the water tank alternative is not an available

22 and feasible alternative, and that the City has failed to meet its burden to demonstrate that

23 it is available and feasible.

24       **(2)    The City Has Not Met Its Burden of Proving That the**

25                    **"Right-of-Way Alternative" Is Available, Feasible, or**

26                    **Less Intrusive.**

27       95.    The City's own RF consultant determined that locating a facility in the right-

28 of-way on Thousand Oaks Boulevard would not achieve the same coverage objectives as

[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  the flag pole alternative would.  (*Id.*; 43:0871 ("Our drive test data showed that coverage

2  for the two existing T-Mobile sites is equal to or slightly less . . . than the coverage

3  shown on the maps presented by T-Mobile . . . ."); 45:1016 (same); 45:1019 (City's RF

4  consultant stating "there's still a lot of gray area here where there's no good coverage").)

5  Thus, it is not technologically feasible.

6          As one Councilmember summed it up on the final night of hearings:

7                  I don't know if [the right-of-way] is a good alternative any

8                  more, looking at the undergrounding of wiring, the additional

9                  things that have to be placed on the pole, the boxes that will be

10                 there, and, basically, the lack of coverage.

11  (45:1046.)

12          96.    As demonstrated above, T-Mobile's options for siting the Facility are greatly

13  limited by the City's restrictive zoning code:  Under the zoning ordinance, and given T-

14  Mobile's coverage objective and certain technological constraints, T-Mobile could either

15  locate a facility at the school site, or it could locate antennas on top of existing light

16  standards in the right-of-way along Thousand Oaks Boulevard.  (24:0440-42.)  T-Mobile

17  selected the school site and flag pole design over the Thousand Oaks right-of-way in part

18  because the flag would be a natural fit on a public school campus, and it would locate the

19  Facility 200 feet from the nearest street, and nearly 300 feet from the nearest residence,

20  thus minimizing any impacts on surrounding uses.  (29:0637 (aerial site photograph);

21  29:0652; 32:0705-06.)

22          97.    Locating one or more facilities along Thousand Oaks Boulevard, by

23  contrast, would place the facility immediately adjacent to residential uses.  (32:0705.)  As

24  T-Mobile's representative explained, "we deal with these a lot.  And the right-of-way

25  sites don't generate any less controversy than putting up a regular [pole]."  (32:0744.)

26  Indeed, the record is replete with evidence that the closer a facility is located to

27  residential uses, the more public opposition, due to stated fears about potential health

28  effects and reduced property values.  (*See, e.g.*, 18:0343 (letter requesting that City not

1   allow facilities within 500 feet of any residential zone); 19:0352-56 (student petition);

2   30:0656-59 (letters regarding impact on real estate values due to perceived health

3   effects); 30:0662-69 (many project opponents expressing concerns about health effects);

4   32:0729-32 (residents speaking against facilities in residential neighborhoods).)  As one

5   of the opponents noted in congratulating the City Council for denying the CUP, "many of

6   the opponents of the Lindero Canyon Middle School cell towers (sic) were not NIMBYs

7   or not in my backyard people. . . .  Frankly, ***we don't want to see cell towers in anyone's***

8   ***backyards*** . . . ." (52:1133-34 (emphasis added).)

9         98.    Moreover, the City had no standards regulating the placement of wireless

10  facilities in the right-of-way; it was therefore speculative that T-Mobile could obtain the

11  approvals needed to locate a facility, including the equipment boxes, in a City right-of-

12  way.  (29:0646; 32:0706; 32:0736.)  T-Mobile was not required to pursue a speculative

13  alternative.  *City of Anacortes*, 572 F.3d at 998.  In fact, the City Council expressed

14  concern that if it permitted T-Mobile to locate in the right-of-way along Thousand Oaks

15  Boulevard, this could set a negative "precedent" that could result in many more providers

16  seeking the same arrangement.  (32:0735-36.)  As one Councilmember put it: "It seems to

17  me that there are alternative sites that are reasonable, that are feasible, except for, in one

18  case, whether or not it can be on the right-of-way and on a light standard, which raises

19  issues of setting precedent."  (32:0748.)  Indeed, the City adopted its Wireless

20  Moratorium in part because of its concerns about placement of wireless

21  telecommunications facilities in the rights-of-way.  (32:0756; 38:0808, Wireless

22  Moratorium, finding E (proliferation of wireless facilities in and adjoining residential

23  zones cited as basis for the moratorium); *id.*, finding G(3) (citing rights-of-way

24  management issues and protection of residential neighborhoods).)

25        99.    Not only did the right-of-way alternative present regulatory and legislative

26  barriers, the evidence reveals that it is not feasible because of issues related to locating

27  the equipment cabinets in an underground vault, or above ground in the landscaped

28  median of Thousand Oaks Boulevard.  (32:0747.)  T-Mobile's representative pointed out

[JOINT PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

that underground utilities such as sewers could preclude the placement of equipment boxes in vaults underneath the right-of-way.  (32:0715, 0746.)  If the equipment were to be located above ground, it would have to be located behind a protective barrier like the one proposed at the school site, which would consist of an eight-foot high block wall enclosing an area large enough to house the six equipment cabinets, each of which measures approximately 2' x 4' x 6'.  (32:0747; 5:0021; 1:0002-B.)

100.   At the City's request, T-Mobile agreed to conduct further study of the right-of-way alternative to determine if it would be feasible from a construction standpoint.  (32:0750.)  T-Mobile consulted maps of the relevant area, which indicate a sewer line running down the median where T-Mobile would have to place a vault 10-15 feet deep if it were to underground the equipment.  (45:1025.)

101.   In addition to the fact that the right-of-way alternative is infeasible and speculative, the City has not shown that the right-of-way alternative would be less aesthetically "intrusive" than the flag pole.  To locate antennas in the right-of-way, "radomes" (cylindrical structures containing antennas) would have to be mounted on top of existing light standards.  (32:0716.)  In addition, as City staff and T-Mobile made clear, the existing light standards are located in close proximity to residences.  (29:0644; 32:0708.)  The radomes will add either 6 feet or 9 feet to the existing light standards and will be either 18 or 24 inches in diameter.  (32:0716.)  Since the existing light standards are 29 feet tall, adding the radomes would result in a total height of 36-38 feet.  (*Id*.; *see also* 32:0746 (estimating 34-38 feet).)  Of course, this would result in added visual mass and height of the existing light standards.  (43:0883.)  Moreover, the City failed to take into account the aesthetic impacts of an above ground equipment enclosure in the median of Thousand Oaks Boulevard.

102.   The City has failed to carry its burden of demonstrating that there are less intrusive, available, and technologically feasible sites.  Thus, its denial of the CUP constitutes an effective prohibition of service in violation of the Telecom Act.  47 U.S.C. § 332(c)(7)(B)(i)(II); *City of Anacortes*, 572 F.3d at 998.

**B.     The Proper Remedy Is an Injunction Ordering Issuance of the CUP.**

103.   Where, as here, a public agency fails to comply with the requirements of the Telecom Act, the "appropriate remedy is injunctive relief in the form of an order to issue the relevant permits[,]" because "injunctive relief best serves the [Telecom Act's] stated goal of expediting resolution of this type of action."  *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d at 497.  Thus, the matter should not be remanded to the City.  To do so would "frustrate the TCA's intent to provide aggrieved parties full relief on an expedited basis."  *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 20 F. Supp. 2d 875, 878-80 (E.D. Pa. 1998), *aff'd* 181 F.3d 403 (3d Cir. 1999); *see also City of Anacortes*, 572 F.3d at 990, 998 (holding that "the City's denial of the application without showing the existence of some potentially available and technically feasible alternative constituted an effective prohibition of service, ***which the district court properly enjoined***" (emphasis added)).

Dated:  December 20, 2010

_____

Hon. Dale S. Fischer
United States District Judge